1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

THOMAS SUPRANOVICH,

               Petitioner,

    v.

WILLIAM HUTCHINGS, *et al.*,

               Respondents.

Case No. 2:21-cv-01269-RFB-BNW

**ORDER**

### I.    INTRODUCTION

This habeas action is brought by Petitioner Thomas Supranovich under 22 U.S.C. § 2254. Respondents filed a Motion to Dismiss (ECF No. 30) Supranovich's Amended Petition (ECF No. 18) as untimely and that certain claims should be dismissed as unexhausted. For the reasons discussed below, the Court grants Respondents' Motion to Dismiss, denies a certificate of appealability, and instructs the Clerk of the Court to enter judgment and close this case.

### II.    BACKGROUND

In September 2014, during a welfare check, police discovered Supranovich's 88-year-old father, Demetry Supranovich ("Demetry"), dead on a couch lying naked in his own feces. See ECF No. 32-44 at 13–14. Supranovich challenges a conviction and sentence imposed by the Eighth Judicial District Court for Clark County. Pursuant to a jury verdict, Supranovich was found guilty of the second-degree murder of a victim 60 years of age or older. On September 22, 2016, the state court entered an amended judgment of conviction and sentenced him to 10 to 25 years with an enhancement of 8 to 20 years. Supranovich appealed and on July 26, 2018, the Nevada Court of Appeals affirmed the judgment of conviction.

On August 5, 2019, Supranovich filed a state post-conviction habeas petition. The state

1    district court denied the petition and Supranovich appealed. On November 9, 2020, the Nevada

2    Supreme Court affirmed the conviction. On December 4, 2020, remittitur issued. On July 6,

3    2021, Supranovich dispatched the instant federal habeas petition for filing. See ECF No. 1.

4    Following appointment of counsel, he filed his amended petition. See ECF No. 18.

5            Respondents now move to dismiss Supranovich's petition as untimely. See ECF No. 30.

6    In addition, they argue that Grounds 1 and 2 should be dismissed as unexhausted and

7    procedurally barred. Supranovich does not dispute that his *pro se* petition was filed 201 days

8    late. Supranovich argues that he can overcome any procedural bars, including the statute of

9    limitations, on the basis that he is actually innocent. See ECF No. 36.

10           **III.    DISCUSSION**

11        **A. Actual Innocence Standard**

12           Demonstrating actual innocence is a narrow "gateway" by which a petitioner can obtain

13   federal court consideration of habeas claims that are otherwise procedurally barred, including

14   claims filed after the expiration of the federal limitation period. See Schlup v. Delo, 513 U.S.

15   298, 314–15 (1995); Lee v. Lampert, 653 F.3d 929, 932 (9th Cir. 2011) (en banc) (A "credible

16   claim of actual innocence constitutes an equitable exception to AEDPA's limitations period, and

17   a petitioner who makes such a showing may pass through the Schlup gateway and have his

18   otherwise time-barred claims heard on the merits."); see also McQuiggin v. Perkins, 569 U.S.

19   383, 386 (2013). In this regard, "actual innocence" means actual factual innocence, not mere

20   legal insufficiency. See, e.g., Sawyer v. Whitley, 505 U.S. 333, 339 (1992). "To be credible, [an

21   actual innocence] claim requires petitioner to support his allegations of constitutional error with

22   new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness

23   accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324.

24   The narrow Schlup standard is satisfied only if the new, reliable evidence, together with the

25   evidence adduced at trial, demonstrates that it is more likely than not that no reasonable juror

26   would have found the petitioner guilty beyond a reasonable doubt. See id. at 329.

27           "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the

28   threshold requirement unless he persuades the district court that, in light of the new evidence, no

1    juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"

2    McQuiggin, 569 U.S. at 386 (quoting Schlup, 513 U.S. at 329); see also House v. Bell, 547 U.S.

3    518, 538 (2006) (emphasizing that the Schlup standard is "demanding" and seldom met). When

4    conducting a Schlup gateway review, a court "must 'assess how reasonable jurors would react to

5    the overall, newly supplemented record,' including all the evidence the petitioner now proffers."

6    Stewart v. Cate, 757 F.3d 929, 938 (9th Cir. 2014) (quoting Lee, 653 F.3d at 945). The court's

7    "function is not to make an independent factual determination about what likely occurred, but

8    rather to assess the likely impact of the evidence on reasonable jurors." Id. (quoting House, 547

9    U.S. at 538).

10       Supranovich contends that he is actually innocent. He asserts that trial counsel failed to

11   call independent pathologist, Dr. Todd Grey ("Dr. Grey"), to offer testimony disputing the

12   coroner's cause of death assessment. Respondents argue that Supranovich fails to meet the

13   standard for passing through the actual innocence gateway because the allegedly new evidence is

14   not reliable and, nonetheless, it cannot overcome the evidence that the jury heard against

15   Supranovich.

16       **B.  Relevant Trial Evidence**

17       At trial, the State presented testimony that Supranovich was inside the home when

18   officers arrived to perform a welfare check and found Demetry dead on the couch naked lying in

19   his feces. Supranovich did not initially answer the door when the police arrived at Demetry's

20   home until the police observed Supranovich walking around the home through a window. During

21   the welfare check, it was observed that Supranovich acted suspiciously, used Demetry's debit

22   card, had cash on him, and requested that no autopsy be performed because he wanted his father

23   cremated immediately. Supranovich withdrew money from Demetry's account on ten different

24   occasions, including the day that the police arrived to perform a welfare check. Items of value,

25   like jewelry, were packed up in Demetry's home.

26       Supranovich informed the police that he last saw Demetry at 4 A.M., that Demetry drank

27   an entire bottle of alcohol, and that Demetry fell. An autopsy report showed, however, that

28   Demetry had been dead for 12–24 hours, that Demetry did not ingest alcohol or food, and that

1    there was no sign that he had fallen.

2        The jury heard testimony that Supranovich had a "rocky" and at points "hostile"

3    relationship with Demetry. Demetry advised a hospice care nurse that Supranovich was not

4    permitted in his home. Another nurse was informed that Demetry had called the police.

5    Supranovich was not supposed to be inside his father's home on the day of the welfare check.

6    The elected constable for Laughlin testified that he initiated eviction proceedings on Supranovich

7    at the request of Demetry. A nurse testified that Supranovich refused to leave despite receiving a

8    notice of eviction.

9        Demetry had an injury to his mouth that was consistent with being smothered and a

10   pillow was found in the home with blood on the corner of the pillow. There was no external

11   injury associated with a fall. A witness that worked at 7-Eleven testified that she observed

12   Supranovich with blood on his hands.

13       Dr. Dutra testified that Demetry was in deteriorating health and had changes in his heart

14   consistent with his age. Dr. Dutra concluded that the cause of death was undetermined but noted

15   that there were suspicious circumstances. On cross-examination, Dr. Dutra agreed that Demetry

16   was near the end of his life. He noted that Demetry had a small laceration of the tongue that

17   could have been caused by smothering but agreed that there were multiple reasons why a person

18   could get a laceration like that. Dr. Dutra did not rule out that Demetry could have fallen

19   resulting in him biting his tongue.

20       Dr. Dutra further testified that he found that Demetry had an enlarged heart, which could

21   cause heart failure, death, and arrhythmia—i.e., an abnormal beating of the heart. He testified

22   that such condition could be the cause of death. He testified that Demetry was receiving

23   treatment for chronic obstructive pulmonary disease ("COPD"), and that he also found that

24   Demetry had another life-threatening condition called moderately severe focally calcific

25   coronary artery arteriosclerosis. Dr. Dutra found that Demetry had previously suffered from a

26   heart attack.

27       Dr. Dutra testified that he did not find anything that was an indication of a defensive

28   wound. He agreed that smothering someone with a pillow would require firmly holding the

1    pillow against an individual's face and that it would not be effective to use the corner of the

2    pillow. Dr. Dutra testified that he was not aware that Demetry was diagnosed with dementia but

3    that did not alter any of his opinions.

4    **C.  New Evidence**

5         Supranovich asserts that trial counsel rendered ineffective assistance by failing to call

6    independent pathologist, Dr. Todd Grey ("Dr. Grey"), to testify regarding his findings that

7    disputed the State's medical examiner's two key findings. See ECF No. 18 at 5–20. In a letter to

8    trial counsel, Dr. Grey determined that the cause of death was likely arrhythmia:

9         I do not think the cause of death in this case is unknown. The decedent had multiple
          pathologic abnormalities that could easily explain death. His heart was in bad shape
10        with evidence of having had at least one episode of infarction in the past. In addition
          to having compromised arteries, he had enlargement that would increase the
11        demand for oxygen and blood. Further exacerbating his tenuous cardiac status is
          his lung disease that would also decrease delivery of oxygen to his body. All of
12        these factors would put him at risk for sudden death from an arrhythmia.

13

14    ECF No. 18 at 16.

15    In addition, Dr. Grey disputed the theory that smother was a possible cause of death:

16        I do not agree that there is pathologic evidence of smothering in this case. The
          finding of a small laceration of the tongue can be equally explained by the
17        possibility of the decedent having bit his tongue while eating or if he stumbled and
          fell. (The decedent required a walker to ambulate). Another possibility is the tongue
18        injury resulted from terminal seizure activity that could result from inadequate
          delivery of blood and oxygen to the brain during the dying process. There is also
19        no evidence of injury to the lips, nose or adjacent areas. It is clear from the autopsy
          pictures that the decedent had fairly fragile skin and would be expected to bruise
20        easily if subjected to a forceful smothering. I also found no evidence of defensive
          injuries. In a conscious victim, smothering is a very noxious event and would not
21        be passively accepted without any attempts to unblock the airways. There is no
          evidence of incapacitating injury or intoxication that would diminish or remove the
22        decedent's response to having his airways blocked. I do not agree with Dr. Dutra's
          contention that smothering can produce unconsciousness in as little as 15 seconds.
23        While this may be true for strangulation (of which there is no evidence in this case)
          it is not accurate for smothering.
24

25    Id. at 17.

26    **D.  The Nevada Appellate Court's Relevant Ruling**

27         On appeal of his second successive state post-conviction habeas petition, the Nevada

28    Court of Appeals addressed Supranovich's actual innocence argument. The Nevada Court of

1    Appeals found that "Supranovich did not allege that Dr. Grey had independently examined the

2    victim, and Dr. Grey's report indicates the opinion was based on certain materials submitted for

3    his review, such as an autopsy report and a transcript of the medical examiner's preliminary

4    hearing testimony." ECF No. 34-32 at 7. In addition, the Nevada Court of Appeals held that "Dr.

5    Grey's report and any attendant testimony would have, at most, presented the jury with

6    conflicting opinions regarding the victim's cause of death," and "[a]lthough such evidence may

7    have been useful in establishing reasonable doubt, it does not amount to a colorable showing of

8    actual innocence." Id.

9        **E. Supranovich Fails to Meet the <u>Schlup</u> Standard.**

10        The newly presented evidence does not demonstrate that that it is more likely than not

11    that no reasonable juror would have found Supranovich guilty beyond a reasonable doubt.

12    Supranovich attempts to discredit the State's medical examiner, Dr. Dutra's, findings based on

13    an independent pathologist's conclusions that were not presented at trial. The jury, however,

14    heard testimony at trial from Dr. Dutra that Demetry had an enlarged heart, which could cause

15    heart failure, death, and arrhythmia and specifically that such condition could be the cause of

16    death. In addition, the jury heard Dr. Dutra agree that Demetry was near the end of his life, his

17    hospice care nurses testified at trial, and the jury was presented with testimony regarding the

18    multiple health conditions that Demetry had, including COPD and dementia. The jury also heard

19    Dr. Dutra testify that there were multiple reasons why a person could get a laceration on the

20    tongue, including that Demetry could have fallen resulting in him biting his tongue. Although

21    Supranovich's new evidence could have supported the conclusion that Demetry died of natural

22    causes, the jury could have continued to believe the State's theory of the case based on the

23    evidence presented at trial.

24        The Court is not persuaded that Dr. Grey's findings demonstrates evidence so strong as to

25    undermine confidence in the jury's verdict.  None of the materials demonstrate Supranovich's

26    actual innocence.  By determining that Supranovich fails to meet the demanding <u>Schlup</u> standard,

27    the Court finds that Supranovich has not made a viable claim that actual innocence allows him to

28    bypass AEDPA's statute of limitations and the Court grants Respondents' motion to dismiss.

**F. Certificate of Appealability**

Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a certificate of appealability ("COA").  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether this Court's procedural ruling was correct. See id.  To meet the threshold inquiry, a petitioner has the burden of demonstrating that the issues are debatable among jurists of reason; that a court could resolve the issues differently; or that the questions are adequate to deserve encouragement to proceed further. See Allen v. Ornoski, 435 F.3d 946, 950–51 (9th Cir. 2006).

Applying these standards, this Court finds that a certificate of appealability is unwarranted.

**IV.   CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that Respondents' Motion to Dismiss (ECF No. 30) is **GRANTED**. Petitioner Thomas Supranovich's Amended Petition (ECF No. 18) is dismissed.

It is further ordered that Petitioner is **DENIED** a certificate of appealability.

The Clerk of Court is directed to enter judgment accordingly and close this case.

**DATED:** September 28, 2025.

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

- 7 -